UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

RODNEY PORTERFIELD and )
JURAIL CHANCELLOR, )
    Plaintiffs; )
 )
-vs.- ) No. CV-97-P-332-S
 )
WESTERN AUTO SUPPLY COMPANY, )
    Defendant. )

FILED 98 DEC 21 PM 2:58 U.S. DISTRICT COURT N.D. OF ALABAMA

ENTERED DEC 22 1998

## OPINION

The defendant's Motion for Summary Judgment was considered at a prior motion docket. For the reasons expressed herein, the motion is due to be granted.

### Facts[1]

1. <u>Rodney Porterfield</u>

Plaintiff Rodney Porterfield, a black male, began working for defendant Western Auto Supply on October 2, 1993. In February 1995 he was promoted to General Manager of the Bessemer store, and in July 1995 he became General Manager at the Woodlawn location. Porterfield's immediate supervisor was District Manager Anita Enfinger, who was replaced by Doug White in March 1996. Both Enfinger and White are white.

In April 1996, during a routine audit of Porterfield's store, the auditor discovered a problem with paid-outs, which are slips documenting amounts of money removed from the store safe for store

---

[1] The recitation of "facts" is based upon the presented materials viewed in the light most favorable to the plaintiffs.

expenses. Specifically, some paid-outs did not have receipts attached, as required, and had not been sent to the Home Office for reimbursement. Additionally, some paid-outs had been sent to the Home Office without receipts attached. The auditor turned the documents over to one of the defendant's Loss Prevention Investigators, who began an investigation.

During an interview of Porterfield at Doug White's office, the defendant's Regional Human Resources Manager, Manny Blackner, stopped by to meet with White. Blackner spoke briefly to the investigator about the discrepancies and then to White, who showed him Porterfield's paid-outs. Blackner then met with Porterfield and White. Although Porterfield told Blackner he could get the missing receipts, he allegedly could not explain why he had not followed the procedure for completing the paid-outs. Without consulting Porterfield's personnel file or the report prepared by the investigator, Blackner and White decided to terminate Porterfield on April 4, 1996 for improperly handling paid-outs.

The defendant replaced Porterfield with Walter Green, a black male who had been a Store Manager at the Woodlawn location. The defendant also terminated two other managerial employees in Birmingham in April 1996, a black store manager and a white general manager. Both were replaced by black employees.

Porterfield timely filed an EEOC charge and then brought this action on February 7, 1997, alleging claims of race discrimination under Title VII and 42 U.S.C. § 1981. Specifically, Porterfield contends that Western Auto investigated him because he was eligible to become district manager and Western Auto did not want a black district manager. In support of his claim of discrimination in job assignments, hiring, promotions, pay, and other terms and conditions of employment, Porterfield alleges several instances of disparate treatment, including that 1) white

2

managers engaged in misconduct and were not terminated, 2) he earned a lower salary than white managers, 3) his store was audited more than white managers' stores, 4) because of his race he was asked to set up an employee suspected of stealing, 5) white managers could take vacations but he could not, 6) he was forced to open his store during an ice storm, and 7) white managers called Doug White "Doug" but Porterfield had to call him "Mr. White."

Several of the defendant's arguments relate to Porterfield's Chapter 13 bankruptcy proceedings. Porterfield filed under Chapter 13 in January 1992. Porterfield never listed his discrimination claims against the defendant as an asset, despite the fact that he filed his EEOC charge on May 27, 1996. On October 15, 1996, the bankruptcy court granted the trustee's motion to dismiss due to Porterfield's material default in payments.

2. Jurail Chancellor

Plaintiff Jurail Chancellor, a black male, began working for the defendant in a part-time sales position in September 1994. At that time, the District Manager was Anita Enfinger and the Woodlawn General Manager was John Bailey. Bailey was replaced by Lanny P'Pool, a white male who was eventually replaced by plaintiff Porterfield in July 1995. Chancellor also held a full-time job at Southeast Health Plan. On January 27, 1995 Chancellor submitted a letter of resignation to Southeast Health Plan. That same day Chancellor accepted a position with TXEN, Inc. His first day at TXEN was February 13, 1995.

On February 10, 1995, after he had accepted employment but before he started his new job, Chancellor filed a document in Bankruptcy Court, where his Chapter 13 case was pending. That document requested that his case be dismissed because he was no longer employed. On February

3

14, 1995 the bankruptcy judge granted Chancellor's motion and dismissed Chapter 13 proceedings. At no time during his proceedings did Chancellor notify the bankruptcy court of his part-time employment with Western Auto or of any claims he might have had against Western Auto.

The facts of Chancellor's termination are not clear. Chancellor testified that Lanny P'Pool fired him because he asked to leave work early to take care of a sick parent. This would have occurred before July 1995. However, Chancellor also contends that Enfinger told Porterfield to fire him because he was a thief. In fact, Chancellor's complaint alleges he was terminated on January 24, 1996. Chancellor further alleges that Walter Green told Enfinger that Chancellor was stealing tires from the stockroom. Although the reason Porterfield gave for Chancellor's change of status on the termination paperwork was that he could not work scheduled hours, Porterfield says that was the only reason he could think of that would not hurt Chancellor. Chancellor also claims he was terminated because he had turned down two white managers' requests that he accept a management position.

Additionally, Chancellor alleges race discrimination based on hiring because the defendant's application or another document allegedly asks applicants to indicate their race. Chancellor also claims discrimination with respect to promotions because, although he was offered a full-time managerial position, he was not offered the salary he requested. In addition, Chancellor contends that the defendant created a problem with his schedule to try to get him to quit his job. He also claims that P'Pool pinched him on the buttocks several times in an effort to induce Chancellor to strike him. Finally, Chancellor alleges that he was initially promised $5.50 an hour but only received $5.00 per hour. When he received a thirty cent per hour increase in January 1995, P'Pool allegedly said, "You people are not used to making this kind of money."

4

Chancellor did not file a charge with the EEOC and seeks to piggyback his claims onto those of Porterfield. On April 25, 1997, this court granted a motion to amend Porterfield's complaint to add the claims of Chancellor.[2]

**Analysis**

1. Rodney Porterfield

In support of its motion, the defendant first argues that Porterfield is barred from bringing his claims because he did not list his discrimination claims as assets in his Chapter 13 bankruptcy. The defendant also contends that Porterfield lacks standing to pursue his claims, which can be brought only by the trustee in bankruptcy. In response to the defendant's arguments, Porterfield asserts that he did not receive his Right to Sue letter from the EEOC until November 1996, one month after his bankruptcy case was dismissed. Although the court acknowledges the defendant's reading of 11 U.S.C. §§ 541(a) & 1306(a)(1), the court notes that any dispute about whether Porterfield knew or should have known that he had causes of action against the defendant prior to the dismissal of the bankruptcy case would preclude summary judgment. Nevertheless, for purposes of this summary judgment motion, the court will assume that Porterfield's failure to schedule his claims in the bankruptcy action would not bar him from bringing this action.

The defendant makes several substantive arguments in support of its motion for summary judgment. With respect to Porterfield's hiring claim, the defendant asserts that Porterfield testified in his deposition that he was not discriminated against in connection with being hired. Indeed,

---

[2] In that order, the court also denied the motion to amend as to the claims of Monica Coleman.

5

Porterfield was hired by the defendant and, in his response brief, disclaims any hiring claim. Thus, the defendant's motion as to the hiring claim is due to be granted.

Similarly, Porterfield's promotion claim is due to be dismissed. Although Porterfield contends that his termination cut short his eligibility for a promotion to district manager, Porterfield does not contest the fact that he was not yet eligible for a promotion. Additionally, Porterfield has not alleged or proved that he was rejected for a promotion. Therefore, the defendant's motion for summary judgment as to the promotion claim is due to be granted.

Porterfield also alleged a race discrimination claim based on pay. In response, the defendant offered evidence showing that Porterfield's salary in September 1995 was less than those of two white general managers hired before him, including Lanny P'Pool, equal to that of another white general manager hired in 1992, and greater than that of a white general manager hired in 1991. In addition, Porterfield received a $1200 salary increase in March 1996, although P'Pool did not. Although Porterfield might be able to show that he was paid less than two similarly situated white general managers for a period of time, he has introduced no evidence to show that any differences in pay were motivated by discriminatory intent. Thus, even if Porterfield could establish a prima facie case, he has not shown that he was paid less than the two white managers because of his race. The plaintiff's pay claim is therefore due to be dismissed.

The defendant also addresses other disparate treatment allegations, arguing that Porterfield has presented no evidence to show that any of the alleged differences in treatment concerning audits, job duties, vacations, snow days, or Doug White's name were motivated by discriminatory intent. As to Porterfield's claim that white managers asked him, prior to March 1994, to set up an employee to see if he was stealing, the defendant asserts that the claim is barred by applicable statutes of

6

limitation under both § 1981 and Title VII. Because the court agrees with the defendant's arguments and finds no evidence suggesting intentional discrimination, Porterfield's "terms and conditions" claims are due to be dismissed.

Porterfield's remaining claim relates to his termination. Although he cannot show that he was replaced by a nonminority, Porterfield may still establish a prima facie case by showing that the misconduct for which he was terminated was nearly identical to that engaged in by white managers who were not terminated.[3] Porterfield has named six white managers whom he alleges engaged in similar misconduct but were not terminated. However, three of these managers were no longer working for the defendant when decisionmakers Blackner and White began overseeing the Birmingham area. The defendant's evidence indicates that the alleged misconduct of the other three managers occurred prior to the time Blackner and White took over the Birmingham area. The Eleventh Circuit has held that different supervisors' disciplinary measures may not be comparable in Title VII analysis.[4] Only if Porterfield presented evidence that Blackner and White knew of the alleged past misconduct and consciously failed to discipline the managers would evidence as to the six white managers be relevant to his prima facie case. Porterfield has not done this.[5]

In response to the defendant's arguments on the termination claim, Porterfield asserts that the defendant did not apply its progressive discipline policy to him as it did to white managers.

---

[3] *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

[4] *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).

[5] To the extent Doug White testified that P'Pool's store standards were terrible, he may have known of P'Pool's past misconduct and reprimands. However, this misconduct did not involve paid-outs and is therefore not relevant for comparative purposes.

7

Specifically, Porterfield offers evidence that white managers received written reprimands, including some covering paid-outs, prior to being terminated. In each of the instances alleged, the white manager was written up by a different decisionmaker prior to the time Blackner and White took over. Additionally, when White terminated a white manager in April 1996, he did not know of that manager's prior problems and write ups and, as in Porterfield's case, did not consult the manager's personnel file. Although Porterfield did not receive any written reprimands before he was terminated, he has not shown that the written reprimands from a different decisionmaker are relevant or that the decisionmakers in his case selectively applied disciplinary practices.

However, even if this court were to assume that Porterfield has established a prima facie case, the defendant has offered a legitimate nondiscriminatory reason for terminating him. The defendant terminated Porterfield because he improperly handled paid-outs. Porterfield has failed to introduce evidence showing that the reason was pretextual. Although another employee alleged that the defendant's investigator used the word "nigger" one time, that evidence is insufficient to show that the defendant's reason for Porterfield's termination was pretextual. Similarly, the evidence concerning how employees addressed Doug White does not establish pretext because white and black employees called him "Doug." Consequently, the defendant's motion for summary judgment as to the termination claim is due to be granted.

2. Jurail Chancellor

The defendant makes several arguments in support of its motion for summary judgment. One of these arguments focuses on Chancellor's failure to file an EEOC charge. Chancellor may rely on Porterfield's charge in bringing his Title VII claims only if 1) Porterfield's charge was timely and

8

not otherwise defective, and 2) the claims of both plaintiffs arose out of similar discriminatory treatment in the same time frame.[6] Although Chancellor may meet the first requirement, he has not met the second. Although Chancellor has alleged that he was actually terminated twice, the last alleged termination occurred in January 1996, several months before White replaced Enfinger and before Porterfield was terminated. Additionally, the two plaintiffs complain of different discriminatory treatment from different decisionmakers. In fact, Porterfield was the general manager who, at Enfinger's direction, allegedly terminated Chancellor in January 1996. Because Chancellor's claims do not arise out of similar discriminatory treatment in the same time frame, he cannot rely on Porterfield's EEOC filing. Therefore, the defendant's motion for summary judgment as to Chancellor's Title VII claims is due to be granted.

The defendant also contends that Chancellor's § 1981 claims are barred by the two-year statute of limitations. Because Chancellor wrongfully informed the bankruptcy court that he was not employed, the defendant argues, Chancellor should be estopped from alleging that he was terminated after February 10, 1995. Therefore, the § 1981 claims brought on April 16, 1997 would be filed more than two years after the last alleged discriminatory act.

Even if the court declined to find Chancellor's § 1981 claims time-barred, however, the defendant's motion would still be due to be granted. Chancellor simply has not produced evidence to support his claims. Despite his allegations of discrimination with respect to his job application, Chancellor has not proved the existence of a race-related question on his application materials or discrimination in connection with those materials. Chancellor applied for a part-time job and

---

[6]*See Calloway v. Partners National Health Plans*, 986 F.2d 446, 449 (11th Cir. 1993) (citing *Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1011-12 (11th Cir. 1982)).

9

received one. His hiring claim is due to be dismissed.

Similarly, summary judgment is due to be granted in favor of the defendant on Chancellor's promotion claim. Chancellor testified that he turned down a store manager's position, negating any claim that he was rejected for a promotion. Although he claims that the defendant would not meet his salary requirements, Chancellor has not shown that the defendant's refusal to pay him at least $37,000[7] was based on his race. Chancellor has failed to establish a prima facie case of discrimination with respect to promotions.

Chancellor's termination claim is also due to be dismissed. Even if this court considers both dates on which Chancellor alleges he was terminated, the court finds no evidence of intentional discrimination. Chancellor's allegation that P'Pool pinched him does not suggest that discriminatory intent played a part in his termination. In the absence of anything more than conclusory allegations, the defendant's motion is due to be granted.

As for Chancellor's claims relating to scheduling, job assignments, and pay, the court finds no evidence that similarly situated white employees were treated differently than Chancellor. Additionally, the alleged statement made by P'Pool when Chancellor received his raise is not sufficient to establish discriminatory intent. Therefore, the defendant's summary judgment motion is due to be granted as to Chancellor's remaining claims.

**Conclusion**

Because the court finds no genuine issues of material fact, the motion for summary judgment

---

[7]Plaintiff Porterfield made approximately $30,000 as a general manager, a higher position than a store manager.

as to the claims of both plaintiffs is due to be granted and the case is due to be dismissed.

Dated: December 21, 1998

                                                Chief Judge Sam C. Pointer, Jr.

Service List:
    Ms. Cynthia Forman Wilkinson
    Mr. Richard A. Meelheim
    Mr. William A. Robinson
    Mr. William K. Thomas
    Mr. Joseph V. Musso